COVELL v. BRIGHT.

EASEMENTS AND SERVITUDES — DEEDS — WATERS AND WATER-
COURSES.
   A purchaser of land for residence purposes, receiving a war-
   ranty deed of the premises, is not subjected to a servitude, of
   an artificial drain, based on prescriptive rights, running
   under the highway from property of a prior grantor in the
   chain of title, who also conveyed by warranty deed, where it
   was not a visible drain or known to the purchaser, and was
   not shown to be necessary to the enjoyment of the property
   drained.

Appeal from Kent; Perkins, J. Submitted May 4,
1909. (Docket No. 111.) Decided July 6, 1909.

Bill by Chester F. Covell against Garrison S. Bright
and others to enjoin the obstruction of a drain. From a
decree dismissing the bill, complainant appeals. Af-
firmed.

*Colin P. Campbell*, for complainant.
*Smedley & Corwin*, for defendants.

BLAIR, C. J. The facts in this case were agreed upon
by counsel for the respective parties, pursuant to the pro-
viso in section 3, Act No. 340, Pub. Acts 1907. Complain-
ant's mother, being the owner of certain lands on section
15, in the township of Walker, in Kent county, died in
1893, and the title thereto descended to complainant.
Complainant, upon the death of his father in 1895, suc-
ceeded to the title to certain lands on section 22 in said
township. Before the construction of any drain, a de-
pression which might be called a swale originated on sec-
tion 22 in the township of Walker, Kent county, Mich.,.
about 16 rods west of the north and south quarter line
dividing that section, and about 16 rods south of the north

section line dividing sections 22 and 15. This swale from this point of origin ran to the north, then broadened out into a small pond about 5 rods across. West of said point there was a slight rise in the ground, and farther west there was another swale about 25 rods west of the pond aforesaid. In times of high water the water from the east ran westward into the west pond, which extended northward to the section line, and at that point was about 3 rods wide. This swale continued at about the same width across the section line to the north and northeast, and terminated about 10 rods north of the section line in a pond, or swamp, about 5 rods across. This swamp was on section 15, and has no surface outlet whatsoever. The swale was surrounded on all sides by hills, with a considerable elevation above the bottom of the swale. The only way water disappears is by evaporation and by percolation, or soaking through the ground. There is not now, and never has been, so far as the evidence showed, a living stream at this point, nor are there springs in this swale. These swales, or swamps, have no defined banks, or banks at all. The land from the margin of the swale sloped to a considerable elevation, making large hills; and there is no stream and no flowage of water except in cases of heavy rain, when it naturally runs to the lowest spot. At times of rain moderately heavy, and in the spring when the snow melts, large quantities of water have always accumulated in the swale, and this water has settled in the sag, or side swale, on the south side of the section line, and part of it passed to the north across the section line from section 22 to section 15, drained into the swamp, and there disappeared, partially by evaporation and partially by percolation. The result has been that into this swamp on sections 22 and 15 the surface drainage from that 100 acres on sections 15 and 22 has been wont to gather, and for this surface drainage and the waters flowing on this area there is no other way of escape save by the swale and by percolation and by evaporation.

Prior to 1860 a house had been built on section 22, on the premises now owned by complainant, about 30 rods south of the section line, and about midway between the east and west ponds, south of said section line, and about 15 rods south thereof. A highway had previously been built on the line between sections 15 and 22, and this highway was graded between these swales a few inches above the general surface of the soil. In grading this highway a log culvert was put in, so that the water might pass off from section 22 to the north into the swale on section 15. In times of high water the road was inundated, and people were compelled to go through the fields, or to drive through considerable water. This water, however, passed off in a few days from both sides of the highway by percolation and evaporation, but more rapidly on the north side of the section line. Between 1860 and 1870 complainant's father put in a tile drain between his house and the highway, extending from one swale or pond to the other—that is, from what is called the east swale, or pond, to the west swale, or pond—so as to carry the water from the swale or pond northeast of the dwelling house to the swale or pond northwest of the dwelling house. This tile extended under the driveway, which ran from the public highway to the dwelling house. Complainant's father then filled in the ravine in front of what is now the complainant's house, making a lane and driveway there. The tile drain extended under the highway, which was subsequently graded to a height of four or five feet. Witnesses testified that a plank culvert was put in at the time that the road was graded higher, but this seems to have disappeared, and the water has followed the tile drain laid by complainant's father. The fall in this tile drain is 4 or 5 feet in 35 rods. This tile drain remained substantially undisturbed until 1902, when the Grand Rapids, Grand Haven & Muskegon Railway Company built its road on section 15, north of, and immediately adjoining, the highway. This road was graded to about level with

the highway, and a large tile culvert was put through the embankment northerly over the earlier tile drain.

In 1904 complainant laid off his land on section 15, for residence purposes and suburban homes, into tracts of five acres each. One of these parcels, which contained the swale or pond in controversy, was sold to Emery Toogood. On this parcel sold to Toogood there was a high and dry building spot, and Toogood built a house there. The land was dry at the time, and there were no indications of any tile running under the railway track on this land. The tile was below the surface of the ground, and the ground had been cultivated, but the end of said tile drain, and the last tile thereof, extended into an open ditch some 6 inches or a foot beyond the earth covering the remainder of said tile, and the open ditch ran to the north 10 or 15 feet. At the time Mrs. Dempsey bought there was snow on the ground, and at the time Mr. Toogood bought this swale or pond was filled with quite a rank growth of vegetation. At the time of the purchase Toogood did not go down into the low ground, as nothing was said by the complainant about the tile running under the highway, and part of his water south of the highway on section 22 coming onto the land on the north side of the highway on section 15; nor was anything said about this by Mr. Covell, the complainant, or anybody else, and Mr. Toogood made no inquiry in regard to it, and therefore Mr. Toogood knew nothing about it. Mr. Toogood afterwards cultivated this land and plowed it, but the tile was below the surface, and he never discovered it. Mr. Toogood subsequently sold three acres of these five acres to Ida May Dempsey, and Ida May Dempsey subsequently sold one acre to Mrs. Richards, and one acre to Mrs. Emma McCarthy. Subsequently Mrs. Dempsey orally agreed to sell the parcel of one acre in which the tile drain ends, and in which a portion of the swale lies, to defendant Bright, who, after this oral contract, began hauling sand, and succeeded in partially filling the tile so that the water was, to a large extent, prevented from running through, before the service of the

injunction in this case. Bright subsequently abandoned his oral contract of purchase with Mrs. Dempsey, and after such abandonment Mrs. Dempsey went upon the premises and plugged the tile with cement concrete.

There is no system of public drainage of any sort nor any public sewer, and the water gathers in these two swales or ponds or swamps, one on the south side of the highway, and one on the north of the highway, and the swamp on the north side of the highway being a little lower than the one on the south side, if not interrupted, would gather more water when the tile is stopped up, and the stopping up of the tile prevents the water from the south side from coming onto the north side of the highway to a certain extent, but when the water gets high enough to pass through the tile under the right of way of the interurban railway company, it still continues to flow onto the north side onto the land owned by the said Ida May Dempsey, but the stopping of the tile has caused the water to stand in the swamp on the south side of the highway longer than it otherwise would, but both pieces of land become dry during the summer. The complainant, Covell, knew at the time he sold to Emery Toogood that said property was bought for the purpose of building thereon suburban homes. He gave to said Toogood a warranty deed, with full covenants, and free and clear from all incumbrances.

The court dismissed complainant's bill for an injunction and damages, and complainant has appealed to this court. It is clear that this record does not present a case of interference with the flowage of a natural watercourse or with the natural flowage of surface waters. The right to discharge the waters from section 22 upon section 15 through the artificial drain was a prescriptive right. The question, therefore, for our consideration is whether defendant Toogood, notwithstanding his full covenant warranty deed, took the lands conveyed burdened with this prescriptive right. To entitle the complainant to a decree the burden was upon him to establish that the servitude

was apparent, continuous, and strictly necessary to the enjoyment of his lands. 14 Cyc. p. 1169; *Carbrey* v. *Willis*, 7 Allen (Mass.), 364 (83 Am. Dec. 688); *White* v. *Chapin*, 97 Mass. 101; *Crosland* v. *Rogers*, 32 S. C. 130 (10 S. E. 874); *Dolliff* v. *Railroad*, 68 Me. 173; *Butterworth* v. *Crawford*, 46 N. Y. 349 (7 Am. Rep. 352); *Treadwell* v. *Inslee*, 120 N. Y. 458, 465 (24 N. E. 651); *Wells* v. *Garbutt*, 132 N. Y. 430, 435 (30 N. E. 978). We are of the opinion that complainant did not establish by a preponderance of the evidence, either that the existence of the subterranean drain was so apparent that defendant Toogood was chargeable with notice thereof, or that it was necessary to the enjoyment of his property.

The decree is affirmed, with costs to defendants.

MONTGOMERY, HOOKER, MCALVAY, and BROOKE, JJ., concurred.